UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

JONES LANG LASALLE AMERICAS, INC.,

      Plaintiff,

v.                                                                                                                    JURY TRIAL REQUESTED

VESSEL OPERATING HOLDCO LLC and
REEF TECHNOLOGY, INC.,

      Defendants.
_____/

## COMPLAINT

Plaintiff Jones Lang LaSalle Americas, Inc. ("JLL"), by and through undersigned counsel, files this Complaint against Defendants Vessel Operating Holdco LLC ("Vessel") and Reef Technology, Inc. ("Reef") (collectively "Defendants"). For its causes of action, JLL states the following:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff JLL is a Maryland corporation with its principal place of business in Chicago, Illinois. JLL is thus a citizen of Maryland and Illinois.

2. Defendant Vessel is a Delaware limited liability company with its principal place of business in Miami, Florida. Upon information and belief, the members of Vessel are citizens of Delaware and Florida. Vessel is thus a citizen of Delaware and Florida.

3. Defendant Reef is a Delaware corporation with its principal place of business in Miami, Florida. Reef is thus a citizen of Delaware and Florida.

4. This Court has personal jurisdiction over both Defendants Vessel and Reef, as they have their principal places of business and conduct substantial operations in Florida and this district.

5. The amount in controversy between the Parties, as more specifically discussed herein, exceeds $75,000.00, exclusive of interest and costs.

6. This Court therefore has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a).

7. Venue is appropriate in this Court for this dispute pursuant to 28 U.S.C. § 1391(b) because a Defendant resides in this District, a substantial part of the events or omissions giving rise to the action occurred in this District, and/or a substantial part of property that is the subject of the action is situated in this District.

## GENERAL ALLEGATIONS

8. JLL is a global commercial real estate services company that, among other things, manages real estate and provides property and project management services for its clients.

9. JLL accordingly enters into contracts, statements of work, and other agreements with its clients to provide property and project management services, including services to maintain and repair the client's properties and equipment.

10. Reef proclaims that it is the largest operator of parking real estate in North America.

11. Part of Reef's business model is to use its network of parking-lot sites throughout the United States and Canada to host vessels that serve as "ghost kitchens"[1] or other retail outlets. These vessels are essentially vehicle trailers that are equipped with full-service kitchens, which are either parked in parking lots or driven around as a food trucks. Different restaurants' menu items could be prepared in these vessels for pickup by food delivery services.

12. Reef desired for JLL to provide variable facilities maintenance and repair services for the kitchen and retail vessels across Reef's network of sites. In particular, Reef desired for JLL to manage reactive maintenance and repair work for the kitchen and retail vessels.

**A. Pilot Project**

13. Before fully launching JLL's provision of maintenance and repair services for Reef across its network of sites and vessels, the Parties decided to undertake a pilot project.

14. Reef issued purchase orders to JLL for the pilot project. One was Purchase Order 15395 relating to certain fees and expenses, including JLL's management fees, and totaled $544,500.00. *See* Purchase Order 15395 (dated July 1, 2021) (Exhibit A).

15. JLL issued invoices to Reef for the fees and expenses, including JLL's management fees, owed for the services provided pursuant to the pilot project and Reef's Purchase Orders. Four such invoices issued by JLL to Reef for fees and expenses from the

---

[1] "Ghost kitchens are commercial kitchens that exclusively prepare delivery orders. The word 'ghost' refer to the fact that you can't walk up to these places to order – nor can you sit down and eat your food there." Ghost kitchens "can be repurposed retail stores, warehouses [and] shipping containers." *See* What Is a Ghost Kitchen?, https://reeftechnology.com/kitchens/what-is-a-ghost-kitchen (last accessed Apr. 12, 2022).

pilot program included Invoices Reef111821-US-15395, Reef112321-US-15395, Reef121621-US-15395, and Reef122921-US-15395.

### B. Master Services Agreement

16. Desiring to fully launch JLL's provision of maintenance and repair services for Reef's network of sites and vessels, JLL and Reef then negotiated and agreed upon the terms and conditions of the written agreement that would govern the provision of those services.

17. However, before JLL and Reef consummated the deal, Reef advised JLL that it desired for its affiliate Vessel to be the party to enter into the written contract with JLL for the maintenance and repair services. JLL acceded to Reef's request.

18. Accordingly, on July 9, 2021, JLL and Vessel entered into a Master Services Agreement ("MSA"), wherein JLL agreed to provide variable facilities maintenance and repair services, through its own employees and/or contractors, across Reef/Vessel's network of sites and vessels. *See* MSA (Exhibit B).

19. The MSA provided that the Parties would enter into a Statement of Work ("SOW") for the services JLL would perform at Reef/Vessel's facilities. *See* MSA, ¶ 1.1.

20. The MSA further provided that, before JLL performs any services pursuant to an SOW, it must first receive an approved purchase order from Reef/Vessel. *See* MSA, ¶ 1.1.

21. The Parties accordingly entered into an SOW, attached as Exhibit A to the MSA, wherein JLL agreed, expecting to be compensated, to maintain and repair the kitchen and retail vessels' structural issues, hot-cold equipment, fire suppression systems, electrical systems, plumbing, and heating and cooling systems. *See* MSA, Ex. A-SOW.

22. The SOW provided that JLL would receive maintenance and repair work orders via Reef/Vessel's work order system and would then provide services to ensure the work order was satisfactorily addressed and resolved. *See* MSA, Ex. A-SOW.

23. Reef/Vessel, in turn, agreed to compensate JLL for the services provided as set forth in Exhibit B to the MSA. *See* MSA, ¶ 2.1.

24. The MSA provides that it is to be construed under the laws of the state of Delaware and the federal laws of the United States, *see* MSA, ¶ 9.5, and that, in litigation with respect to the MSA, the prevailing party is entitled to recover its reasonable attorneys' fees and court costs from the losing party, *see id.*, ¶ 9.1.

**C. The MSA's Compensation and Termination Provisions**

25. The MSA's Exhibit B, entitled Compensation, detailed how JLL would be compensated:

   a. <u>Labor Costs</u> – JLL was to be reimbursed for "Labor Costs," which includes the salaries, wages, overtime, and bonuses for the JLL employees dedicated to providing the services (and a portion of those JLL employees partially dedicated to providing the services) plus an associated burden charge of thirty-seven percent (37%) of the sum of the base salary and wages and bonuses for each non-union JLL employee. *See* MSA Ex. B-Compensation, ¶ 5.1.

   b. <u>Platform Costs</u> – JLL was to be reimbursed for "Platform Costs," which were a proportionate share of costs incurred by JLL for platform support resources, such as human resources, sourcing, and finance administration as detailed in Attachment B-2-Platform Costs. *See id.*, ¶ 5.2.

    c. <u>Pass-Through Goods and Services</u> – JLL was to be reimbursed for goods and services, costs directly passed to Reef/Vessel without a mark-up, such as subcontractor fees and expenses, costs of supplies and materials to perform services, costs to correct any violations of laws not caused by JLL's negligence or willful misconduct, cost of capital expenditures pursuant to an approved budget, and for time and materials for work performed by JLL's mobile maintenance technicians. *See id.*, ¶ 5.3.

    d. <u>Other Items and Charges</u> – JLL was to be reimbursed or paid for any other costs, expenses, charges and allocations of JLL related to the services, provided they are approved in advance in writing by Reef/Vessel. *See id.*, ¶ 5.4.

    e. <u>Out of Scope Services</u> – JLL was to be reimbursed for any services JLL agreed to perform, outside the scope of the MSA, provided the costs, expenses, charges, and allocations were approved in advance in writing by Reef/Vessel. JLL was entitled to its 7% fee for out-of-scope services unless otherwise agreed to. *See id.*, ¶ 5.5.

    f. <u>Management Fee</u> – JLL was to receive a "Management Fee" for services provided, equal to seven percent (7%) of the aggregate of all costs managed by JLL, except for Labor Costs and Platform Costs. *See id.*, ¶ 3.1.

26. The MSA's Exhibit B further provided that Reef/Vessel would prepare, and the Parties would agree upon in writing, an "Approved Budget" for the annual costs of the services to be provided by JLL under the MSA and its SOW. *See* MSA Ex. B-Compensation, ¶ 1(a).

27. The Parties' initial Approved Budget, Attachment B-3 to the MSA's Exhibit B on Compensation, covered the year from the commencement of JLL providing the services on July 1, 2021, through June 30, 2022, and totaled $11,533,190.00. *See* MSA Ex. B-Compensation, ¶ 1(b)-(c) & Attachment B-3.

28. Consistent with the Approved Budget, the Parties agreed that Reef/Vessel would submit to JLL two (2) purchase orders per year, one (1) for facilities in the United States and one (1) for facilities in Canada, for the services JLL would provide under the MSA and SOW. *See* MSA Ex. A-SOW, ¶ 7.2.

29. The Parties further agreed that JLL would submit to Reef/Vessel four (4) invoices per month for all costs payable under the agreement, two (2) for services performed for facilities in the United States and two (2) for services performed for facilities in Canada. *See* MSA Ex. A-SOW, ¶ 7.1.

30. The MSA required payment of JLL invoices within thirty (30) days of their receipt. *See* MSA, ¶ 2.2.

31. Payments were considered delinquent if a JLL invoice was not paid with forty-five (45) days after its due date. *See* MSA, ¶ 2.2.

32. Delinquent payments earned interest (accruing from the applicable due date) at the lesser of: (i) the rate of one and one-half percent (1.5%) per month; or (ii) the maximum rate permitted by law from the date due until paid. *See* MSA, ¶ 2.2.

33. JLL could terminate the MSA due to Reef/Vessel's failure to perform its obligations under the MSA, including failing to pay JLL for services provided. *See* MSA, ¶ 3.1.

34. Upon JLL providing written notice of default due to non-payment, the MSA provided Reef/Vessel with ten (10) business days to remedy the default. *See* MSA, ¶ 3.1. If those ten (10) days expired without the default from the non-payment being remedied, JLL had the authority to terminate the MSA for cause without further notice. *See id.*

### D. Transition Fees

35. Recognizing the significant investment being made by JLL to meet its obligations under the MSA and the potential for an early termination of the MSA, the MSA provided for a Transition Fee if JLL terminated the MSA for cause before the conclusion of the MSA's initial three (3)-year term. *See* MSA, Ex. B-Compensation, ¶ 2.

36. The agreed-to Transition Fee was $244,778, which was to be amortized on a straight-line depreciated fashion over the three (3)-year term of the MSA. *See* MSA, Ex. B-Compensation, ¶ 2.

37. The monthly depreciation of the Transition Fee is thus $6,799.39. Hence, as of March 18, 2022, the remaining amount of the Transition Fee totaled $190,383.

### E. Work Order System

38. In order for JLL to complete its contractual obligations, it was provided access to Reef/Vessel's work order system. This ensured that JLL could access the details of the work orders from Reef/Vessel and satisfactorily address those work orders.

39. The work order system also included sufficient detail about the services provided by JLL and invoiced to Reef/Vessel, allowing Reef/Vessel to review the exact breakdown of costs and services provided by JLL and invoiced to Reef/Vessel.

### F. JLL's At-Risk Management Fee

40. JLL agreed to place fifty percent (50%) of its Management Fee "at risk," meaning Reef/Vessel's obligation to pay fifty percent (50%) of the Management Fee would be contingent on JLL's performance. *See* MSA, Ex. B-Compensation, ¶ 4.

41. The Parties agreed JLL's performance would be measured by its Key Performance Indicator ("KPI") score, ranging between 1 and 5. *See* MSA, Ex. B-Compensation, ¶ 4. The Parties agreed to the following table, included in Paragraph 4 of the MSA's Exhibit B-Compensation, reflecting the percentage of the Management Fee that JLL would be entitled to receive based on its KPI score:

| KPI Score | Percent of Management Fee Earned |
|---|---|
| 1.0 - 1.4 | 50% |
| 1.5 - 1.9 | 55% |
| 2.0 - 2.4 | 65% |
| 2.5 - 2.9 | 75% |
| 3.0 - 3.4 | 90% |
| 3.5 - 3.9 | 100% |
| 4.0 - 4.4 | 105% |
| 4.5 - 4.7 | 110% |
| 4.8 - 5.0 | 120% |

42. Thus, if, for example, JLL received a low KPI score of 1, it would be entitled to only fifty percent (50%) of the Management Fee. *See* MSA, Ex. B-Compensation, ¶ 4. However, if JLL received a KPI score of 5, JLL would be entitled to receive 120% of its Management Fee. *See id.*

43. The Parties agreed to determine on a quarterly basis the KPI score and any payments due for the Management Fee "at risk." *See* MSA, Ex. B-Compensation, ¶ 4.5. If JLL earned a KPI score less than 3.5, it was required to refund the appropriate amount of the Management Fee back to Reef/Vessel. *See id.* And if JLL earned a KPI score of 4.0 or greater,

Reef/Vessel was required to pay JLL the additional performance incentive fees earned for that quarter. *See id.*

44. The KPI score was based on JLL's performance under the MSA, including performance against expense projections and work order completion time for standard, scheduled, emergency, and emergency closure requests. *See* MSA, Ex. B-Compensation, ¶ 4.

45. JLL's KPI score thus depended, in large part, on JLL's ability to timely obtain performance from the personnel and subcontractors it enlisted for the maintenance and repair services specified in the work orders received from Reef/Vessel. JLL's ability to obtain such timely performance depended, in turn, on JLL's ability to timely compensate those performing the services. And JLL cannot timely compensate the service providers if Reef/Vessel has failed to timely pay JLL. That is the circumstance that unfortunately manifested here.

**G. Purchase Orders and Invoices To/From Reef, Not Vessel**

46. Although Reef made a last-minute substitution of Vessel as the party to the MSA with JLL, from the start of the MSA, JLL received purchase orders from Reef, not Vessel. *See* Purchase Order Nos. 1196 and 16018 (dated July 8, 2021) (Exhibits C and D).

47. JLL has accordingly issued invoices to Reef for the services provided under the MSA, referencing the Reef purchase orders in each invoice, as required by the MSA. *See* MSA, Ex. B-Compensation, ¶ 7.

48. When the Parties were calculating the KPI score and amounts due for the "at risk" portion of the Management Fee for 2021 Q3, JLL sent the correspondence to Reef, not Vessel, and the calculations were agreed to by an employee of Reef, not Vessel. *See* Jan. 18, 2022 Letter (Exhibit E).

49. In addition, when JLL was requested to open its books and records for an audit of the work performed under the MSA, the request came on Reef letterhead and began "Vessel Operating Holdco LLC ("**REEF**") hereby notifies…." *See* March 18, 2022 Letter (Exhibit F).

50. Based on the foregoing facts and course of dealings, it is clear that there is no legal distinction between Reef and Vessel. They are, in essence, one in the same entity, effectively operating as the other's alter ego for all material purposes herein. They are both therefore liable for obligations undertaken by Reef/Vessel in the MSA, including, without limitation, the obligation to timely pay the invoices issued by JLL thereunder.

**H. Reef Fails to Fully and Timely Pay for Services Provided by JLL**

51. Starting in October 2021, only four (4) months after entering into the MSA, well aware of its obligations to compensate JLL for services rendered, Reef/Vessel began to breach the MSA.

52. As it had done since the commencement of the Parties' contractual relationship, on October 25, 2021, JLL issued an invoice (totaling $259,680.03) to Reef/Vessel for JLL's expenses under the MSA for services provided in the United States for the preceding time period. *See* Invoice dated Oct. 25, 2021 (Exhibit G).

53. To JLL's surprise, Reef/Vessel failed to fully pay the October 25, 2021, invoice and fully compensate JLL for services rendered. Reef/Vessel instead began its practice of paying JLL only for the work provided by JLL's subcontractors and excluded any payment for JLL's services, including payroll and other fees authorized by the MSA. Of the $259,680.03 owed, Reef/Vessel paid JLL only $181,289.70, leaving JLL in the negative by $78,390.33.

54. JLL continued to timely invoice Reef, but Reef/Vessel continued its practice

of underpayment to JLL for the remainder of 2021, while continuing to demand and accept JLL's services.

55. Starting in 2022, Reef/Vessel stopped paying JLL for *anything*, including for work by JLL's subcontractors as well as JLL's fees.

56. A chart detailing Reef/Vessel's payment failures is below and attached as Exhibit H. It includes invoices not timely and fully paid by Reef/Vessel for JLL's services provided during both the pilot project (invoices ending with "15395" for Reef Purchase Order 15395) and under the MSA (invoices ending with "16018" and "1196" for Reef Purchase Orders 16018 and 1196).

| JLL Invoices Due from REEF | Outstanding Amount (USD) as of 3/31/22 | Partial Payment Made | Total Invoice Amount |
|---|---:|---:|---:|
| Reef102521-US-16018 | 78,390.33 | 181,289.70 | 259,680.03 |
| Reef111821-US-15395 | 587.43 | 3,091.73 | 3,679.16 |
| Reef111821-US-16018 | 45,036.89 | 235,241.68 | 280,278.57 |
| Reef112321-US-15395 | 602.64 | 3,171.81 | 3,774.45 |
| Reef112321-US-16018 | 21,025.90 | 300,369.97 | 321,395.87 |
| Reef11422-US-16018 | 361,167.38 | - | 361,167.38 |
| Reef121621-US-15395 | 370.26 | 1,948.76 | 2,319.02 |
| Reef121621-US-16018 | 38,363.31 | 548,047.35 | 586,410.66 |
| Reef122321-US-16018 | 61,215.24 | 171,716.54 | 232,931.78 |
| Reef12622-US-16018 | 503,197.15 | - | 503,197.15 |
| Reef12921-US-15395 | 7,245.20 | 38,132.00 | 45,377.20 |
| Reef12921-US-16018 | 107,936.59 | 419,904.48 | 527,841.07 |
| Reef22122-US-16018 | 477,915.24 | - | 477,915.24 |
| Reef22522-US-16018 | 422,296.61 | - | 422,296.61 |
| Reef2922-US-16018 | 364,334.24 | - | 364,334.24 |
| Reef31122-US-16018 | 427,122.56 | - | 427,122.56 |
| Reef31822-US-16018 | 269,022.78 | - | 269,022.78 |
| Reef32522-US-16018 | 150,499.81 | - | 150,499.81 |
| **TOTAL** | **3,336,329.56** | **1,902,914.02** | **5,239,243.58** |

| JLL Invoices Due from REEF | Outstanding Amount (CAD) as of 3/31/22 | Partial Payment Made | Total Invoice Amount |
|---|---|---|---|
| Reef112321-Canada-1196 | 637.32 | 8,057.14 | 8,694.46 |
| Reef11422-Canada-1196 | 38,148.22 | - | 38,148.22 |
| Reef122321-Canada-1196 | 1,435.87 | 18,152.60 | 19,588.47 |
| Reef12622-Canada-1196 | 38,964.82 | - | 38,964.82 |
| Reef12921-Canada-1196 | 1,966.10 | 20,865.41 | 22,831.51 |
| Reef22122-Canada-1196 | 30,175.57 | - | 30,175.57 |
| Reef22822-Canada-1196 | 58,951.96 | - | 58,951.96 |
| Reef2922-Canada-1196 | 118,990.20 | - | 118,990.20 |
| Reef31122-Canada-1196 | 42,411.81 | - | 42,411.81 |
| Reef31822-Canada-1196 | 79,858.48 | - | 79,858.48 |
| Reef32522-Canada-1196 | 137,050.51 | - | 137,050.51 |
| TOTAL | 548,590.86 | 47,075.15 | 595,666.01 |

### I. Reef/Vessel's Failure To Pay Leads JLL's Subcontractors To Refuse Work

57. Since Reef/Vessel refused to pay JLL for the services rendered, JLL was unable, in turn, to pay its subcontractors who performed the actual maintenance and repair services requested by Reef/Vessel. This led JLL's subcontractors to refuse to timely perform services requested by Reef/Vessel, via JLL.

58. Reef/Vessel's failure to pay JLL's invoices naturally led to a perception that JLL was not performing satisfactorily. This, in turn, impacted JLL's KPI score in a negative way and accordingly JLL's ability to receive some or all of its Management Fee "at risk."

59. JLL's KPI score for the first quarter of its performance (2021 Q3) was 2.0, which entitled JLL to sixty-five percent (65%) of its Management Fee. *See* January 18, 2022 Letter (Exhibit E).

60. JLL received a KPI score for 2021 Q3 of 2.0, in part, because it could not meet certain performance metrics due to Reef/Vessel's failure to fully and timely pay JLL's invoices for the services provided.

61. JLL advised Reef/Vessel that its KPI calculation was not a true reflection of JLL's service level performance based, in part, on Reef/Vessel's non-payment.

62. Reef/Vessel's failure to fully and timely pay JLL's invoices and resulting breaches of the MSA became so material and substantial, thereby frustrating JLL's ability to timely perform its obligations, that JLL informed Reef/Vessel that it was suspending the "at risk" portion of the Management Fee for 2021 Q4 and thereafter until Reef/Vessel returned to a normal and consistent funding process.

**J. JLL Notifies Reef/Vessel of Non-Payment and then Terminates the Agreement**

63. JLL sent Reef/Vessel multiple emails regarding its past due invoices, including emails in early 2022. JLL also repeatedly raised the lack of payment issue in several weekly leadership meetings with Reef/Vessel.

64. JLL advised that it operated in reliance on Reef/Vessel's timely payment and was harmed by Reef/Vessel's failure to timely pay the invoices.

65. Reef/Vessel was well aware of the rapidly-increasing outstanding balances, increasing by hundreds of thousands of dollars a week, resulting from its non-payment.

66. On March 7, 2022, after well more than sixty (60) days trying to work with Reef/Vessel to pay its bills, JLL was forced to send Vessel written notice of its default for its failure to pay multiple invoices that came due between November 24, 2021, and February 25, 2022. JLL demanded that Reef/Vessel remedy the default and comply with its contractual obligations to pay for services by curing the late payments by March 18, 2022, as provided under Paragraph 3.1 of the MSA. *See* March 7, 2022 Letter (Exhibit I).

67. Reef/Vessel failed to cure its payment deficiencies and default by March 18, 2022.

68. On March 18, 2022, pursuant to Paragraph 3.1 of the MSA, JLL sent Reef/Vessel a letter terminating the MSA effective close of business that day. *See* March 18, 2022 Letter (Exhibit J).

69. As of the filing of this action, Reef/Vessel has not made any further payments on the outstanding invoices.

70. The MSA entitles JLL to continue to seek payment of the outstanding invoices after it has terminated the agreement. *See* MSA, ¶ 3.2.

71. All conditions precedent to initiating this action have been satisfied or waived.

72. JLL has retained undersigned counsel and agreed to pay them a reasonable fee for their services in prosecuting this action.

## COUNT I – BREACH OF CONTRACT
### (Against Reef for Pilot Project)

73. JLL incorporates by reference and realleges the allegations in Paragraphs 1 through 72 above, as though fully set forth herein.

74. As set forth above, JLL and Reef entered into a binding and enforceable contractual agreement for the Parties' pilot project.

75. Reef issued Purchase Order 15395 to JLL for monthly maintenance services.

76. JLL accepted Purchase Order 15395 and performed its obligations under the Parties' agreement of providing monthly maintenance services as requested by Reef.

77. JLL issued invoices to Reef for the maintenance services performed for the pilot project pursuant to Purchase Order 15395.

78. Reef was required to pay the invoices within thirty (30) days of receipt.

79. Reef materially breached its duties and obligations under the Parties' agreement by failing to timely and fully remit payment to JLL for all of the invoices issued for monthly maintenance for the pilot project.

80. A chart detailing Reef's payment failures for invoices for the pilot project is below:

| JLL Invoices Due from REEF | Outstanding Amount (USD) as of 3/31/22 | Partial Payment Made | Total Invoice Amount |
|---|---|---|---|
| Reef111821-US-15395 | 587.43 | 3,091.73 | 3,679.16 |
| Reef112321-US-15395 | 602.64 | 3,171.81 | 3,774.45 |
| Reef121621-US-15395 | 370.26 | 1,948.76 | 2,319.02 |
| Reef12921-US-15395 | 7,245.20 | 38,132.00 | 45,377.20 |
| **TOTAL** | **8,805.53** | **46,344.30** | **55,149.83** |

81. As a direct and proximate result of Reef's material breach of the Parties' contractual agreement by failing to pay the foregoing invoices for the pilot project, JLL has incurred damages.

82. JLL's damages continue to increase as interest continues to accrue.

**WHEREFORE**, Plaintiff JLL prays for judgment in its favor and against Defendant Reef for monetary damages, pre-judgment and post-judgment interest, litigation costs and expenses, and such other and further relief as the Court deems just and proper.

### COUNT II – BREACH OF CONTRACT
### (Against Reef and Vessel for the Master Services Agreement)

83. JLL incorporates by reference and realleges the allegations in Paragraphs 1 through 72 above, as though fully set forth herein.

84. As set forth above, JLL and Vessel entered into a binding and enforceable contractual agreement, to wit: the MSA and its attachments.

85. As set forth above, Reef, as Vessel's alter ego, is also bound by the terms and conditions of the MSA and its attachments to the same extent as Vessel.

86. JLL performed its obligations under the Parties' contractual agreement, including by providing the maintenance and repair services specified in the MSA and its SOW.

87. Pursuant to the Parties' agreement, JLL submitted invoices for the work it and its subcontractors performed in response to the purchase orders and work orders submitted to JLL by Reef/Vessel.

88. Reef/Vessel materially breached its duties and obligations under the Parties' agreement to timely and fully remit payment to JLL for services provided and invoiced, as outlined in the preceding paragraphs.

89. As a direct and proximate result of Reef/Vessel's material breach of the Parties' contractual agreement, JLL has incurred damages, including but not limited to the following categories:

   a. Unpaid invoices for the services rendered by JLL and its subcontractors, including but not limited to labor costs, management costs, and material costs for a total unpaid balance as of the filing of this action of $3,327,524.03 and CA$548,590.86; and

   b. The remaining Transition Fee as of March 18, 2022 of $190,383.

90. JLL is entitled to its full Management Fee and to the suspension of the "at risk" component of the Management Fee beginning in 2021 Q4 because Reef/Vessel frustrated and inhibited JLL's ability to obtain a high KPI score due to Reef/Vessel's failure to timely and fully make the payments required under the Parties' agreement.

91. JLL's damages continue to increase as interest continues to accrue and invoices become due and are not paid.

**WHEREFORE**, Plaintiff JLL prays for judgment in its favor and against Defendants Vessel and Reef jointly for monetary damages, pre-judgment and post-judgment interest, attorney's fees, litigation costs and expenses, and such other and further relief as the Court deems just and proper.

### COUNT III – UNJUST ENRICHMENT
### (Against Reef and Vessel in the Alternative)

92. JLL incorporates by reference and realleges the allegations in Paragraphs 1 through 72 above, as though fully set forth herein.

93. JLL pleads this count in the alternative to Counts I and II for breach of contract.

94. JLL has conferred a benefit on Reef/Vessel, including, but not limited to, the fact that JLL has provided maintenance and repair services for Reef/Vessel at its request and for which Reef/Vessel has not fully compensated JLL.

95. Reef/Vessel have knowledge of the benefit that was conferred by JLL, including, but not limited to, the fact that Reef/Vessel is aware that JLL has provided the maintenance and repair services and has requested payment for same.

96. Reef/Vessel voluntarily accepted and retained the benefit conferred by allowing JLL to perform the maintenance and repair services and then not paying for same.

97. Reef/Vessel's retention of the benefit is inequitable unless it pays to JLL for the value of the benefit provided.

**WHEREFORE**, Plaintiff JLL prays for judgment in its favor and against Defendants Vessel and Reef jointly for monetary damages, pre-judgment and post-judgment interest,

litigation costs and expenses, and such other and further relief as the Court deems just and proper.

### COUNT IV – OPEN ACCOUNT
### (Against Reef and Vessel for Pilot Project and MSA)

98.   JLL incorporates by reference and realleges the allegations in Paragraphs 1 through 72 above, as though fully set forth herein.

99.   JLL has provided maintenance and repair services for Reef/Vessel at the request of Reef/Vessel.

100.   JLL has invoiced Reef/Vessel for the services provided.

101.   JLL has demanded that Reef/Vessel pay the invoiced amounts due and owing, including providing Reef/Vessel with documents reflecting an accounting of the amounts owed. *See* Exhibit H.

102.   Reef/Vessel has failed to fully and timely pay the invoiced amounts due and owing to JLL for the services it provided at Reef/Vessel's request.

103.   Reef/Vessel currently owes JLL $3,526,712.56 and CA$548,590.86, with interest.

104.   JLL's damages continue to increase as interest continues to accrue and invoices become due and are not paid.

**WHEREFORE**, Plaintiff JLL prays for judgment in its favor and against Defendants Vessel and Reef jointly for monetary damages, pre-judgment and post-judgment interest, litigation costs and expenses, and such other and further relief as the Court deems just and proper.

Date: April 12, 2022	Respectfully submitted,

/s/ *Daniel B. Rogers*
Daniel B. Rogers (Florida Bar No. 195634)
E-Mail:  drogers@shb.com
Matthew D. Bernstein (Florida Bar No. 92260)
E-Mail: mbernstein@shb.com
SHOOK, HARDY & BACON L.L.P.
Citigroup Center, Suite 3200
201 South Biscayne Blvd.
Miami, Florida 33131
T:  (305) 358-5171

***Attorneys for Plaintiff Jones Lang LaSalle Americas, Inc.***